IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT - 8 2009

Clerk, U.S. District and
Bankruptcy Courts

Civil Action No. _____

KENNETH L. SMITH
23636 Genesee Village Rd.
Golden, Colorado 80401
(303) 526-5451,

    Plaintiff,

v.

HON. CLARENCE THOMAS,
One First Street, NE,
Washington, DC 20543,

HON. ANTONIN G. SCALIA,
One First Street, NE,
Washington, DC 20543,

HON. JOHN G. ROBERTS, JR.
One First Street, NE,
Washington, DC 20543,

HON. JOHN PAUL STEVENS,
One First Street, NE,
Washington, DC 20543,

HON. ANTHONY M. KENNEDY,
One First Street, NE,
Washington, DC 20543,

HON. RUTH BADER GINSBURG,
One First Street, NE,
Washington, DC 20543,

HON. STEPHEN G. BREYER,
One First Street, NE,
Washington, DC 20543,

HON. SAMUEL A. ALITO, JR.,
One First Street, NE,
Washington, DC 20543, and

Case: 1:09-cv-01926
Assigned To : Bates, John D.
Assign. Date : 10/8/2009
Description: Civil Rights-Non-Employ.

HON. SONIA SOTOMAYOR,
One First Street, NE,
Washington, DC 20543
in their official capacities as Justices of
THE SUPREME COURT OF THE UNITED STATES,

     Defendants.

---

## COMPLAINT

---

     COMES NOW Plaintiff Kenneth L. Smith, *in propria persona*, who states as follows:

### STATEMENT OF THE CASE

     Smith cordially invites the named Defendants, counsel, and this Court to voluntarily enter into a binding and irrevocable agreement, under which, he has an absolute right to punish you for any speech of yours that he doesn't like, and you can have no advance warning as to what that speech might be.  He can maliciously destroy your reputation, deprive you of a career, and make you all but unemployable.  You have a formidable array of rights on paper, but you rely on them at your peril, as Smith has absolute authority to arbitrarily rewrite them as he sees fit -- and you have no avenue for reliably enforcing them, because your only possible recourse is to beg for mercy from the King, who (a) lives thousands of miles away, (b) will never bother to read your plea, and (c) has already declared that he doesn't entertain these entreaties in the first place.  And should you get a little too 'uppity,' Smith can send a phalanx of F.B.I. agents to harass and intimidate you -- and you get to pay their salaries.  And, should that fail to convey the message, Smith could have you imprisoned for 180 days for your insolence, without even so much as a trial.

If anyone would accept this regime voluntarily, the rest of us would have cause to question his or her sanity. The last person who tried to impose such a regime on Americans by force was King George III, and we all know how that turned out. But every single incident described here has actually happened to Smith (except for the summary imprisonment, which has actually been alluded to by one judge). **This is the United States Constitution, as interpreted by our lower courts** -- a state of affairs made possible because the Defendants in this case are too busy being celebrities to do the jobs they swore oaths to do.

Smith requests a mandate from this Court requiring the Justices of the United States Supreme Court to hear all petitions brought to that body under a writ of error or in the alternative, a formal declaration that the Bill of Rights is null and void for want of meaningful enforcement.

### INTRODUCTION

[Based on Plaintiff's review of other complaints, it appears customary for litigants who file unusual, ground-breaking actions in this Circuit to alert the Court as to the theories under which they are proceeding. As this matter is to the best of Plaintiff's knowledge *sui generis* and challenges numerous conventions, a detailed outline of the rationale for this case and pressing need for the relief sought is presented herein.

At essence, this matter seeks to litigate the charge raised by retired Judge Robert Bork: that the Republic once known as the United States of America is a *regime* governed by a "judicial oligarchy," Robert H. Bork, Our Judicial Oligarchy, *First Things* 67 (Nov. 1996) at 21, brought about by what he called a "judicial coup d'état." Bork, *Coercing Virtue: The Worldwide Rule of Judges* (New York: AEI Press, 2003), at 13. In short, if judges are free to refuse to apply the law when its objective application would lead to a result that they personally detest, **we no longer have "inalienable rights" but rather, a mere tenancy-at-will in our liberties.**

By abandoning their duty to correct errors and even acts of willful defiance by inferior courts, the defendant Justices of the United States Supreme Court have reduced "Equal Justice Under Law" to a mere shibboleth on the frieze of the Supreme Court building. Indeed, even *they* no longer say what "the law" is, **as the only time that lower courts follow their "binding" precedent is when it takes them where they wanted to go in the first place.** Plaintiff asserts that the Justices' duty to exercise the judicial power is

as compelling as their right to use it, and that they can be forced to exercise it via relief in the nature of mandamus and/or prohibition, and even be removed from office if they willfully refuse to do so.

Smith does not ask this Court to tell the Justices of the highest court in the land how to do their jobs but rather, to compel mere men and women -- all, agents or officers of the United States -- *United States v. Lee,* 106 U.S. 196, 220 (1882), *to do their jobs,* where the Constitution demands it.]

1.  *In Caperton v. A.T. Massey Coal Co.,* No. 08-22 (U.S. Jun. 9, 2009), the United States

Supreme Court decided a dispute involving campaign contributions to judges by litigants, with

the majority making the following salient observations:

> **[T]he Due Process Clause incorporated the common-law rule that a judge <u>must</u> recuse himself when he has "a direct, personal, substantial, pecuniary interest" in a case.** This rule reflects the maxim that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." ...
>
> On these **extreme facts** the probability of actual bias rises to an unconstitutional level. ...
>
> Our decision today addresses **an extraordinary situation** where the Constitution requires recusal.

*Caperton, slip op.* at 6, 16 (citations omitted; emphasis added).

2.  It is difficult to imagine any fact situation any more *extraordinary* or *extreme* than a judge

deciding a case in which s/he is a defendant in tort, the plaintiff is asking for roughly $40 million

in compensatory and punitive damages, at least sixteen 'non-conflicted' judges are available and

authorized by law to hear the matter, and the appeal is statutorily required to be heard by another

court, which are the salient (and, judicially noticeable) facts of *Smith v. Mullarkey,* 121 P.3d 890

(Colo. 2005) (per curiam), *cert. denied,* 547 U.S. 1067 (U.S. Apr. 17, 2006) (No. 05-1055).

3.  Taken together, the rule of law precipitated is that if you have enough money to afford the

services of former Solicitor General Theodore K. Olson, a state judge must recuse himself if "the

4

probability of actual bias rises to an unconstitutional level," *Caperton, slip op.* at 16 … but if you are a man of modest means who is forced to approach that Court *in propria persona* out of brute necessity, the Due Process Clause will not even afford you the barest protection of "the common-law rule that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case." *Id., slip op.* at 6 (citation omitted).

4.    This Brobdignagian violation of equal justice under law and due process of law, creating one rule for those plaintiffs who are wealthy enough to afford the services of Theodore Olson and another for the unwashed masses, forced to argue their cases *in propria persona* out of necessity, is facilitated by the sloth, indolence, and/or favoritism toward moneyed interests displayed by the Defendants.

5.    The "money shot" in this case is a stray observation by a panel of the Tenth Circuit that "*Caperton* demonstrates the proper way for a state-court loser to raise federal-law challenges to a state-court judge's refusal to recuse," *Smith v. Bender*, No. 09-1003, 2009.C10.0001077, ¶ 22 (10th Cir. Sept. 11, 2009) (unpublished), inasmuch as it admits that, while a state judge's refusal to recuse on grounds that she has a personal financial interest in the matter before her is a stand-alone Fourteenth Amendment due process clause violation, *e.g., Tumey v. Ohio*, 273 U.S. 510, 523 (1927), redressable in a federal court, *Carey v. Piphus*, 435 U.S. 247 (1978), **Smith has no right to have the injury remedied by <u>ANY</u> federal court!**  As it is impossible to have a "right" without a corresponding right to a remedy for its invasion, *Marbury v. Madison*, 5 U.S. 137, 163 (1803); *see generally,* 3 Blackstone, *Commentaries On the Laws Of England* 86 (1765), it can no longer honestly be said that we have a Fourteenth Amendment right to due process of law.

6.    The problem, of course, is volume -- and Congress' inability to deal with it intelligently:

Rather than expand the size of the Supreme Court to accommodate the continuing needs for error correction and equal justice under law, it unconstitutionally restricted the Court's docket, thereby resulting in a vast array of deleterious effects which have degraded our courts into a caricature of same.

7.   The most effective structural protection against judicial malfeasance -- the right to have the Supreme Court review a lower court ruling on a writ of error, and to have that decision made part of the law of the land by virtue of a published decision -- was destroyed by the Judiciary Act of 1925, 43 Stat. 936 (1925), ostensibly making such reviews discretionary in nature.

8.   The proper approach to restoring the rule of law in our nation is to expand the Supreme Court to a body of as many as ninety judges, with five-judge panels to address writs of error, and randomly-selected nine-judge panels to decide exotic matters, such as matters of first impression resolved (today, only if you have the resources to retain a member of the *de facto* Supreme Court bar, like the plaintiff in *Caperton*) upon *certiorari* review.

9.   Although it is the Supreme Court's "prerogative alone to overrule one of its precedents," *State Oil Co. v. Khan*, 522 U. S. 3, 20 (1997), that and a dollar won't get you a latté at Starbucks, as the Justices' consistent refusal to perform error-correction in even the most egregious of cases means that lower courts need only follow "binding precedent" when it takes them exactly where they wanted to go in the first place.

10.   Absent some reasonably effective regime of error correction, the United States Supreme Court no longer even has the power to "say what the law is" -- and the law-review-length tomes they (well, actually, their law clerks, as Associate Justice is easily the world's best part-time job, *see*, Justice Stevens Shows No Signs Of Quitting, *Associated Press*, Nov. 29, 2008), ruminate

over for countless hours are scarcely fit to line bird cages, as ordinary citizens like Smith can no

longer rely on the Court's hide-bound pronouncements as authoritative statements of the law.

11.    The lack of internal discipline facilitated by the Judiciary Act has transformed the lower

courts into a judicial Boston Archdiocese -- if not a criminal enterprise -- where bribery scandals

and other acts of favoritism are routinely and quietly quashed.[1]

---

[1] By way of example, the *Galveston Daily News* 'connected the dots' with respect to the scandal
involving former federal judge (and now, convicted felon) Samuel Kent:

> In 2001, there was grumbling about favoritism in Kent's court on Galveston Island. The
> Southern District removed 85 cases from the court. The attorney on all 85 was Richard
> Melancon, Kent's close friend and the host of the reception for the judge's wedding.
>
> The judicial system looked into it and moved the cases. **The judges in charge told the
> public the reason was a heavy caseload.**

Heber Taylor, Judicial Discipline Needs a Full Probe, *Galveston Daily News*, May 15, 2009
(emphasis added).

   *Eighty-five litigants.* Eighty-five litigants, denied the right to have their cases heard by a fair
and independent tribunal. Eighty-five separate acts of honest services mail fraud. *E.g., United
States v. Welch*, 327 F.3d 1081 (10th Cir. 2003) (elements of honest services mail fraud). And
one felony, committed by judges charged with ensuring that incidents like these do not happen.

   Misprision of felony has four elements: (1) commission of the felony alleged; (2) the accused
had full knowledge of that fact; (3) the accused failed to notify authorities; and (4) the **accused
took an affirmative step to conceal the crime**. *United States v. Baez*, 732 F.2d 780 (10th Cir.
1984). But being a federal judge means never having to obey the law; that's how we got Edward
Nottingham, Manuel Real, and Thomas Porteous, among others. "Heavy caseload?" *No.* Your
colleagues on the Fifth Circuit obviously knew what they were doing, **and that what they were
doing was a crime.**

   On information and belief, the Tenth Circuit has had a similar problem with disgraced Chief
Judge Edward Nottingham of the District of Colorado. In short, Nottingham had been caught in
a prostitution scandal, wherein it was learned that he was hiring expensive courtesans (over $1K
per session) on a weekly basis for years. Problem is, unlike Gov. Spitzer, Nottingham was not
independently wealthy; his only possible source of funds was the taking of bribes from litigants,
either in cash or in kind. Not only is he not being prosecuted, but he has been allowed to return
to law practice. *See generally,* Disgraced Hon. Edward J. Nottingham, KnowYourCourts.com,
http://www.knowyourcourts.com/Nottingham/Nottingham.htm (website collecting and archiving

14.   On account of the sloth facilitated by the Judiciary Act, unless your name is Anna Nicole Smith or Exxon-Mobil, the United States Supreme Court is some fresh-faced 25-year-old kid out of Harvard, manifestly unqualified to discharge a Justice's duties.[2]

15.   As a result of their not having to worry about being held to account by the Defendants, federal appellate courts produce a work product so uniformly abysmal that it would cause them to be removed from any profession that insists upon maintaining minimum standards of competence, as one federal district court judge reportedly admitted in open court:

> THE COURT: **At a conference of the Third Circuit, the Court of Appeals defended their unpublished opinions on the ground that they're not well reasoned, they don't give them much thought.** So it's hard to say that that's a well-reasoned opinion that has any precedential value.
> MR. WINEBRAKE: Well, we concede—
> THE COURT: It's instructive on what they'll do without much thought.

Sarah E. Ricks, The Perils of Unpublished Non-Precedential Federal Appellate Opinions: A Case Study of the Substantive Due Process State-Created Danger Doctrine in One Circuit, 81 Wash. L.

---

articles).

[2] David R. Stras, *The Supreme Court's Gatekeepers: The Role of Law Clerks in the Certiorari Process*, 85 Tex. L. Rev. 947, 975 (2007); see also, H.W. Perry, *Deciding to Decide: Agenda-Setting in the United States Supreme Court* 65 (1994) (memos only written in only half of the cases reviewed by Justice Stevens' clerks). In the past twenty years, the output of the Supreme Court has declined roughly 50% (from an average of 155 signed opinions for 1984-85 to about 80 in 2004-06), despite the fact that the volume of petitions for certiorari has roughly doubled during that time. Id. at 979, 982, 987.

The modern Court has abandoned wide swaths of the law, as anywhere from 60-80% of its threadbare docket is dedicated to resolving conflicts between various courts of appeals, and it has abandoned any and all pretense of policing irregular, censurable, and otherwise outright corrupt decisions of our inferior appellate courts, with instances of pure error correction occurring so rarely as to be remarkable. Orin Kerr (Professor of Law, George Washington School of Law), An Unusual Case of Pure Error Correction at the Supreme Court, *OrinKerr.com*, Apr. 24, 2006, at http://www.orinkerr.com/2006/04/24/an-unusual-case-of-pure-errorcorrection-at-the-supreme-court/.

Rev. 217, 269 (2006) (emphasis added).

16.   The Defendants' abandonment of their constitutional duty to police the lower courts has

created a two-tier judicial system, wherein judges with supercharged egos like Chief Judge Alex

Kozinski of the Ninth Circuit are known to write fifty drafts of a published opinion, and admit to

writing opinions "precisely for the purpose of getting into" casebooks, Emily Bazelon, The Big

Kozinski, *Legal Affairs*, Jan-Feb. 2004, whereas panels in his Circuit may issue 150 rulings per

three-day session, Alex Kozinski, Letter (to Judge Samuel A. Alito, Jr.), Jan. 16, 2004 at 5; Per-

functory Justice: Overloaded Federal Judges Increasingly Are Resorting to One-Word Rulings,

*Des Moines Register*, March 26, 1999, at 12 (fifty federal appeals decided in two hours).

17.   The absence of meaningful accountability at either the United States Supreme Court and

federal appellate court levels has transformed federal district courts into petty fiefdoms, wherein

judges are free to enforce only those provisions of the Constitution and United States Code they

personally approve of.[3]

18.   The injurious effects of this two-tier system of justice are disproportionately visited on

---

[3] As one federal magistrate judge has reportedly confessed regarding the *bête noire* of the District
of Colorado, disgraced ex-Chief Judge Edward Nottingham:

> The biggest problem with your case is that Judge Nottingham hates employment cases
> and there's nothing you can do about it. It's random. Now don't get me wrong, he's a fine
> judge, but he just hates employment cases. That's why he will  try to find any way in the
> summary judgment briefs to say there's no material issues and grant summary judgment,
> and if he doesn't, he will make it tough at trial, and you won't win . . . I'm going to look
> you right in the eye and tell you that you're gonna lose.

Pl.'s Mot. For Recusal of Judge Nottingham Pursuant to 28 U.S.C. §144 and §455(a) and (b)(1)
[Dkt. #59], *Phillips v. Pepsi Bottling Group*, No. 05-cv-01322-EWN-KLM (filed Nov. 1, 2007)
at 2.

*pro se* litigants like Smith, forced by brute necessity to present their own cases.[4]

19.   A federal court has "no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).  Accordingly, federal courts cannot countenance a restriction upon their jurisdiction -- mandatory or voluntary -- so severe that it materially impairs their ability to deliver equal justice under law.

20.   Plaintiff seeks relief in the nature of mandamus, requiring the Defendants to decide every case brought before them on a writ of error, and/or those cases brought under other guises due to their advertised practice of only accepting such cases on writs of certiorari.

21.   In the alternative, Smith seeks a declaration from this Court that the Bill of Rights is null and void for want of enforcement, as 'the law of the land' is not what either Congress or even the Defendants say it is, but whatever a panel of lower court judges wants it to be on any given day.

---

[4] *See e.g., Erickson v. Pardus*, No. 06-7317, 551 U.S. ___ (2007), slip op. at 6-7.  Careful review of the case history of Erickson reveals a familiar pattern: The magistrate hands his opinion to the district judge, who affirms the decision, usually without even looking at the file, in a boiler-plate opinion bearing no objective indication whatever that the Article III judge has reviewed the case at all. *E.g., Shell v. Devries*, No. 06-cv-00318-REB-BNB (D.Colo. Jan. 30, 2007); *Signer v. Pimkova*, No. 05-cv-02039-REB-MJW (D.Colo. Nov. 30, 2006); *Baldauf v. Garoutte*, No. 03- RB-01104 (D.Colo. Jul. 20, 2006). The case is appealed to the Tenth Circuit, where it is handed to a clerk right out of law school with directions to 'make it disappear.' The clerk does what he is told and often, inartfully.

The evidence suggests that that the judges of this Circuit often fail to even read the opinions they sign in pro se appeals -- to say nothing of the litigants' briefs, *see e.g., Harrington v. Wilson*, No. 06-1418 (10th Cir. Jun. 7. 2007) (withdrawn). Judge McConnell has a stellar reputation as a constitutional scholar, who has taught law at Harvard and Stanford, Mirela Turc, Judge Michael McConnell Speaks About the Ninth Amendment, *The Observer* (Case West. U.), Oct. 31, 2008 (biographical information), and it would beggar the imagination that he would not know that a matter dismissed for lack of jurisdiction cannot be dismissed 'with prejudice'. In short, way too many unpublished opinions look more like they were written by crazed chimpanzees, as opposed to Article III judges.

## JURISDICTION AND VENUE

22.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (the threshold federal question being one of whether a litigant with a case before a lower federal court which is likely to be appealed to the United States Supreme Court possesses legal authority pursuant to the First, Fifth, Ninth, and/or Tenth Amendments sufficient to compel the Justices to discharge their duty to exercise the judicial Power), arising under 28 U.S.C. §§ 2201-02 and the Constitution.

23.   Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b), as the seat of the United States Supreme Court is within the District, and at least some actions taken by the Defendants and/or their authorized agents are taken within the District.

## PARTIES

24.   Plaintiff Kenneth L. Smith is, and has been for all times pertinent to this action, both a United States citizen and resident of the State of Colorado, and the plaintiff in *Smith v. Krieger*, No. 08-cv-251-CMA-KMT (D.Colo. filed Feb. 6, 2008), the relator in *United States of America ex rel. Smith v. Anderson*, No. 09-cv-1018-PAB-BNB (filed May 1, 2009), and the Appellant in *Smith v. Bender*, No. 09-1003 (10th Cir. filed Dec. 30, 2008).

25.   Defendant Hon. John G. Roberts, Jr. is Chief Justice of the Supreme Court of the United States, an entity created by Article III of the United States Constitution, and primarily responsible for managing that body's administrative processes.

26.   Defendants Hons. Clarence Thomas, Antonin G. Scalia, John Paul Stevens, Anthony M. Kennedy, David H. Souter, Ruth Bader Ginsburg, Stephen G. Breyer, Samuel A. Alito, Jr., and Sonia Sotomayor are Associate Justices of the Supreme Court of the United States.

27-40.   [Reserved.]

## GENERAL ALLEGATIONS

### I. **Facts Pertaining To All Incidents:**

41.    On or about January 4, 2000, a panel of the Tenth Circuit wrote, in a published opinion,
with "binding" precedential effect within that Circuit: "The precedent of prior panels which this
court must follow includes not only the very narrow holdings of those prior cases, but also the
reasoning underlying those holdings, particularly when such reasoning articulates a point of law."
*United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000); *see, In re Smith*, 10 F.3d 723, 734
(10th Cir. 1993) ("We are bound by the precedent of prior panels absent en banc reconsideration
or a superseding contrary decision by the Supreme Court.")

42.    On or about November 4, 1997, the United States Supreme Court wrote in an opinion
that it is that Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*,
522 U. S. 3, 20 (1997).

43.    The United States Constitution is a contract creating an express agency, creating reliance
interests in parties to the contract.

44.    The Fifth Amendment forbids discrimination "that is 'so unjustifiable as to be violative
of due process.'" *Schneider v. Rusk*, 377 U.S. 163, 168 (1964); *Bolling v. Sharpe*, 347 U.S. 497
(1954); *see, Fullilove v. Klutznick*, 448 U.S. 448, 497 (1980) (Due Process Clause has an "equal
protection component").

45.    On or before January 4, 2000, the United States Supreme Court issued the following
pertinent rulings, as summarized herein, pursuant to its authority under Article III of the United
States Constitution:

   a.    "It certainly violates the Fourteenth Amendment ... to subject [a man's] liberty or
         property to the judgment of a court the judge of which has a direct, personal, substan-

tial, pecuniary interest in reaching a conclusion against him in his case." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).

b.   A procedural due process violation is a separate and distinct injury of constitutional magnitude, and may be vindicated even in the absence of damages. *Carey v. Piphus*, 435 U.S. 247 (1978).

c.   A declaration of law is authoritative to the extent necessary for the decision, and must be applied in subsequent cases to similarly situated parties. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 544 (1991); *see also, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

d.   State courts of general jurisdiction have jurisdiction to hear federal civil rights claims and/or facial challenges to a statute grounded in federal law brought on a timely basis by a party with standing to bring them. *Claflin v. Houseman*, 93 U.S. 130 (1876).

e.   Federal district courts have subject matter jurisdiction over facial challenges to the federal constitutionality of state admission bar rules brought by applicants. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-83 (1983).

f.   An act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" *Murray v. the Charming Betsy*, 6 U.S. 64, 118 (1804).

g.   Jurisdiction is the "power to declare the law." *Ex parte McCardle*, 74 U.S. 506, 514 (1869).

h.   "Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities." *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353 (1920).

i.   A judgment "rendered in violation of due process is void in the rendering state and not entitled to full faith and credit elsewhere," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).

j.   The duty of a court is "to construe and give effect to the latest expression of the sovereign will." *Whitney v. Robertson*, 124 U.S. 190, 195 (1888).

k.   "[A] reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

46.   On or before January 4, 2000, the United States Supreme Court made the following germane statements as reasoning underlying its holdings, each articulating a point of law:

    a.   The right of access to the courts is "the right conservative of all other rights" and "the alternative of force." *Chambers v. Baltimore & O. R. Co.*, 207 U.S. 142, 148 (1907).

    b.   "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.  One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

    c.   "To enact a law under the pretense of construing one … [is] a flagrant perversion of the judicial power." *Heiner v. Donnan*, 285 U.S. 312, 331 (1932).

    d.   Courts may not "pause to consider" whether a better statute might have been written, but are compelled to "take the statute as we find it." *Anderson v. Wilson*, 289 U.S. 20, 27 (1933) (Cardozo, J.).

    e.   Congress wrote laws to remedy "defects" in the common law. *Munn v. Illinois*, 94 U.S. 113, 134 (1876)

    f.   No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. *United States v. Lee*, 106 U.S. 196, 220 (1882).

    g.   The Court will abandon a line of precedent if it becomes unworkable. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 854 (1992).

    h.   Significant uncertainty in application of the law impairs everyone's liberties, for when "one must guess what conduct or utterances may lose him his position, one necessarily will 'steer far wider of the unlawful zone,'" *Speiser v. Randall*, 357 U.S. 513, 526 (1958), for "the value of a sword of Damocles is that it hangs -- not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).

    i.   It is the province of the Court to give life to our lawmakers' intent. *United States v. American Trucking Assns.,* 310 U.S. 534, 542 (1940).

    j.   To "take away all remedy for the enforcement of a right is to take away the right itself." *Poindexter v. Greenhow,* 114 U.S. 270, 303 (1884).

47.  Every American citizen has a reliance interest in these and other statements of the United

States Supreme Court as authoritative statements of "what the law is." *Moragne v. States Marine*

*Lines, 398 U.S. 375, 403* (1970); *see also, Marbury, supra.*

48.  Every federal and state judge knows or has reason to know that it remains "[the Supreme

Court's] prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan, supra.; see,*

U.S. Const. art. VI, cl. 2.

49.  Section 1254 of Title 28 of the United States Code provides:

> Cases in the courts of appeals may be reviewed by the Supreme Court by the following
> methods:
>
> (1)  By writ of certiorari granted upon the petition of any party to any civil or criminal
> case, before or after rendition of judgment or decree;
>
> (2)  By certification at any time by a court of appeals of any question of law in any civil or
> criminal case as to which instructions are desired, and upon such certification the
> Supreme Court may give binding instructions or require the entire record to be sent up
> for decision of the entire matter in controversy.

50.  Section 1257(a) of Title 28 of the United States Code provides:

> Final judgments or decrees rendered by the highest court of a State in which a decision
> could be had, may be reviewed by the Supreme Court by writ of certiorari where the vali-
> dity of a treaty or statute of the United States is drawn in question or where the validity of
> a statute of any State is drawn in question on the ground of its being repugnant to the
> Constitution, treaties, or laws of the United States, or where any title, right, privilege, or
> immunity is specially set up or claimed under the Constitution or the treaties or statutes
> of, or any commission held or authority exercised under, the United States.

51.  Section 453 of Title 28 of the United States Code provides (emphasis added):

> Each justice or judge of the United States shall take the following oath or affirmation
> before performing the duties of his office: "I, _____, do solemnly swear (or affirm)
> that **I will administer justice without respect to persons, and do equal right to the**
> **poor and to the rich,** and that I will faithfully and impartially discharge and perform all
> the duties incumbent upon me as XXX under the Constitution and laws of the United
> States.  So help me God."

52-60.  [Reserved.]

## II.  Facts Pertaining To Specific Incidents

### A.  Smith v. Mullarkey I

61.  On or about Oct. 25, 2002, Smith filed a timely appeal -- styled *Smith v. Mullarkey*, No.

02-1481 -- in the United States Court of Appeals for the Tenth Circuit.

62.  In the Table of Contents in his Opening Brief in that case, Smith stated the following:

> II.  SMITH'S CLAIMS SEEKING REDRESS FOR PROCEDURAL DUE PROCESS
> VIOLATIONS AND FACIAL CHALLENGES TO COLORADO'S BAR ADMISSION
> STATUTE ARE OUTSIDE THE AMBIT OF THE ROOKER-FELDMAN DOCTRINE.

Opening Brief, *Smith v. Mullarkey*, No. 02-1481 (10th Cir. filed Nov. 7, 2002), Table of Contents

(emphasis in original).

63.  In his Statement of the Case in his Opening Brief, Smith stated, in pertinent part:

> **This action also asserts facial constitutional challenges** to Rule 201 of the Colorado
> Rules of Civil Procedure, alleging that those bar rules are unconstitutional on their face in
> violation of the First and Fourteenth Amendments.  This action seeks compensatory and
> punitive damages arising out of the deprivation of Smith's due process rights during the
> Colorado bar admission procedure, **and declaratory relief adjudging these bar rules
> facially unconstitutional**, further enjoining their future enforcement.

Id. at 2 (emphasis added).

64.  In the body of his Opening Brief, Smith quoted directly from *Feldman*: "[t]o the extent

that [plaintiffs] Hickey and Feldman mounted a general challenge to the constitutionality of [the

District of Columbia's bar admission statute], however, the District Court did have subject-mat-

ter jurisdiction over their complaints."  Id. at 15 (quoting *Feldman*, 460 U.S. at 482-83).

65.  In their opinion denying Smith's appeal, a panel of the Tenth Circuit made the following

admission:

...[Smith] filed a complaint in federal district court setting forth twenty claims for relief for alleged violations of federal law and of plaintiff's constitutional rights. **Plaintiff sought declarations that the Colorado bar admission process and certain admissions rules were unconstitutional...**

*Mullarkey I, 67 Fed.Appx. 535, slip op. at 4 (10th Cir. Jun. 11, 2003) (emphasis added).*

66.  Despite that admission, a panel of the Tenth Circuit affirmed the District Court's decision to dismiss Smith's complaint -- extinguishing his federally-based facial challenges to Colorado's bar admission statute -- due to an alleged lack of subject-matter jurisdiction.

67.  In *Feldman, supra,* the United States Supreme Court expressly held that federal district courts have subject-matter jurisdiction over claims seeking forward-looking declaratory relief grounded in federal law.

68.  The judges of the Tenth Circuit panel knew or had reason to know that the proper application of *Feldman* to *Mullarkey I* takes on the form of a simple syllogism:

If condition X (a bar applicant[5] challenges the facial constitutionality of a bar admission rule) is true, then Y (a federal district court must hear his claim, by virtue of *Feldman*). Condition X is true (a fact the Tenth Circuit openly admitted; see Paragraph 33, *supra*). Therefore, Y (a federal district court must hear that claim).

69.  The Tenth Circuit decision in *Mullarkey I,* was designated as "not selected for publication," thereby depriving it of any precedential effect.

70.  Smith timely appealed the Tenth Circuit's decision to the United States Supreme Court.

71.  Smith's petition for relief was summarily denied. *In re Kenneth L. Smith,* 540 U.S. 1099 (U.S. Jan. 12, 2004) (No. 03-727[sic]).

72.  As of January 12, 2004, those Defendant Justices then on the Court knew or had reason

---

[5] The class of persons with standing also includes those likely to sit for the bar in the foreseeable future (e.g., law students). *Roe v. Ogden,* 253 F.3d 1225 (10th Cir. 2001).

to know that the *Rooker-Feldman* doctrine was being abused by inferior federal courts. *See e.g., Lance v. Dennis*, 546 U.S. 459, 2006.SCT.00038, ¶ (2006) (per curiam) (Stevens, J.. dissenting) (Versuslaw).

73.   In the two Court terms after Smith's petition was denied, the Defendants heard two cases involving the *Rooker-Feldman* doctrine -- ostensibly correcting rampant abuses at the lower court levels. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U. S. 280 (2005); *Lance, supra.*

74.   The Defendant Justices' predilection for showing favoritism toward moneyed interests is again on display in this series of cases, in the sense that there is one *Rooker-Feldman* doctrine for the Exxon-Mobils of the world and another, much harsher, one for pro se litigants like Smith.

75.   As a direct and inescapable result of the Defendants' sloth, indolence, and/or exercise of favoritism toward moneyed interests, Smith has been denied the enjoyment of certain inalienable rights as duly acknowledged by the decisions of the United States Supreme Court, including but not limited to *Carey v. Piphus, supra* (stand-alone right to vindicate procedural due process violations), *Feldman, supra* (right of a bar applicant to raise facial challenges to state bar admission statute), and *Bolling v. Sharpe, supra* (due process right to equal protection of the laws).

76-80.   [Reserved.]

## B.   Smith v. Mullarkey II

81.   On or about January 10, 2002, Smith filed a lawsuit in Denver District Court which was substantially identical to *Smith v. Mullarkey I*, styled *Smith v. Mullarkey, Case No. 02-CV-127,* alleging an array of violations of federal rights committed by persons acting under color of state law pursuant to 42 U.S.C. §§ 1983-86, and an array of facial challenges to the constitutionality of

Colo. R. Civ. P. 201.[6]

82.  In the aforementioned complaint, Smith presented at least one claim grounded in federal law.

83.  On or about April 9, 2004, in deciding a contested motion to dismiss, Denver District Judge H. Jeffrey Bayless entered an order dismissing Smith's complaint.

84.  On or about May 14, 2004, Smith filed a timely appeal of the aforementioned order in the Colorado Court of Appeals.

85.  The issue presented to the Colorado Court of Appeals in that appeal is as follows:

> Whether the trial court erred in declining jurisdiction over damage claims brought pursuant to 42 U.S.C. § 1983, facial constitutional challenges to a statutory regulation promulgated by an instrumentality of the state, and/or claims brought pursuant to article II, section 6 of the Colorado constitution because the Colorado Supreme Court "has exclusive jurisdiction over matters involving the licensing of persons to practice law."

86.  On or about August 16, 2005, the Colorado Court of Appeals issued an order referring the jurisdictional issue to the Colorado Supreme Court, ostensibly pursuant to § 13-4-110(1)(a), Colo. Rev. Stat. 2004, which states:

> When a party in interest alleges, or the court is of the opinion, that a case before the court of appeals is not properly within the jurisdiction of the court of appeals, the court of appeals shall refer the case to the supreme court. The supreme court shall decide the question of jurisdiction in a summary manner, and its determination shall be conclusive.

87.  On or about August 18, 2005, the Colorado Supreme Court accepted jurisdiction over the jurisdictional question, pursuant to the ostensible authority of § 13-4-110(1)(a).

88.  Section 13-2-102(1), Colo. Rev. Stat. 2004 states, in pertinent part, that "[a]ny provision of law to the contrary notwithstanding, the court of appeals shall have initial jurisdiction over

---

[6] While there were other glaring errors in the Tenth Circuit's unpublished opinion related to the abuse of the *Rooker-Feldman* doctrine, raising them here would be redundant.

appeals from final judgments of the district courts...."

89.  The Colorado Supreme Court is a court of limited jurisdiction, the bounds of which may

be further limited by an act of the state legislature.

90.  In Colo. Rev. Stat. § 13-2-102(1), the Colorado legislature clearly stated its intention to

have the Colorado Court of Appeals consider all initial appeals from the state's district courts,

except in those circumstances specifically enumerated by statute.

91.  On or about October 17, 2005, the justices of the Colorado Supreme Court issued a *per*

*curiam* opinion affirming the District Court's decision denying jurisdiction over Smith's federal

claims, wherein they admitted:

> The court is the defendant in this action.  By operation of the Rule of Necessity, Canon 3
> F., if all or a majority of the court has a conflict, the court must nonetheless hear the case.

*Smith v. Mullarkey, supra., slip op. at 2 & fn. 1.*

92.  The justices of the Colorado Supreme Court either knew or reasonably should have

known that every one of the judges of the Colorado Court of Appeals was facially independent

with respect to this matter, and could have decided the appeal as substitute justices, by operation

of Colo. Rev. Stat. § 13-4-101.

93.  The justices of the Colorado Supreme Court either knew or reasonably should have

known that affirmance of the dismissal would deprive Smith of any forum in which to pursue

claims grounded in federal law, in clear and indisputable contravention of the First and Four-

teenth Amendments.

94.  The justices of the Colorado Supreme Court either knew or reasonably should have

known relevant settled principles of Colorado and/or federal law, including but not limited to the

following:

a.  The Colorado legislature has constitutional authority to apportion jurisdiction between the Colorado Supreme Court and Colorado Court of Appeals.  *Bill Dreiling Motor Co. v. Court of Appeals, 468 P.2d 37 (Colo. 1970).*

b.  Colorado judges have a duty under Article 3 of the Colorado Constitution to *apply* the law, as opposed to *writing* it; as such, they may not lawfully substitute their judgment forthat of the state legislature in interpretation of a statute.  *People v. Summit, 517 P.2d 850 (Colo. 1974).*

c.  The Colorado Supreme Court has no legal authority to expand its own jurisdiction by rule of court.  *People ex rel. City of Aurora v. Smith, 424 P.2d 772 (Colo. 1967).*

d.  The Colorado Supreme Court has an affirmative duty to see that the courts are open to all citizens.  *People v. Spencer, 524 P.2d 1084 (Colo. 1974); Colo. Const. art. 2, § 6.*

e.  The so-called "Rule of Necessity" only applies in situations where an actual necessity exists:

> The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest -- **where no provision is made for calling another in, or where no one else can take his place** -- it is his duty to hear and decide, however disagreeable it may be.

*Philadelphia v. Fox, 64 Pa. 169, 185 (Pa. 1870),* quoted with approval in *United States v. Will, 449 U.S. 200, 214 (1980) (emphasis added).*

f.  A Colorado district court is a constitutionally proper forum for the consideration of claims grounded in federal law.  *Claflin v. Houseman, 93 U.S. 130 (1876); see, Boulder Valley Sch. Dist. R-02 v. Price, 805 P.2d 1085 (Colo. 1991).*

g.  A denial of jurisdiction is not an adjudication on the merits.  *See, Ex parte McCardle, 74 U.S. 506 (1868).*

h.  It is "[the United States Supreme Court's] prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan, 522 U. S. 3, 20 (1997)*

i.  "Courts are constituted by authority and they can not go beyond the power delegated to them.  If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities." *Vallely v. Northern Fire & Marine Ins. Co., 254 U.S. 348, 353 (1920).*

j.  Self-created "canons of judicial ethics" do not supersede the minimum standards of judicial conduct imposed by the Due Process Clauses of the United States and Colorado constitutions.

95.   The justices of the Colorado Supreme Court are reasonably competent public officials, who are charged as a matter of law to with the duty to know the law governing their conduct.

96.   The justices of the Colorado Supreme Court knew or had reason to know that salient allegations in Smith's complaint were materially misrepresented in their written opinion.

97.   On information and belief, the justices of the Colorado Supreme Court deliberately mis-represented certain allegations in Smith's complaint in their opinion in furtherance of a scheme to deprive him of his federal rights, and/or to willfully conceal evidence of a federal felony, 18 U.S.C. §§ 241-42, from the notice of the citizens of the state of Colorado.

98.   The justices of the Colorado Supreme Court either knew or reasonably should have known that they did not have colorable legal authority to usurp the statutory jurisdiction of the Colorado Court of Appeals over the appeal of the District Court's dismissal of Smith's com-plaint.

99.   On information and belief, the justices of the Colorado Supreme Court caused the Oct. 17, 2005 opinion to be published in permanent form in various permanent and on-line publica-tions.

100.   In their Oct. 17, 2005 opinion, the justices of the Colorado Supreme Court made a false and defamatory statement facially injurious to Plaintiff's personal and business reputation.

101.   On information and belief, the justices of the Colorado Supreme Court made this false and defamatory statement either negligently or with full knowledge of its probable falsity, and/or with the intention of injuring Plaintiff's personal and business reputation.

102.   Smith timely appealed the ersatz Colorado Supreme Court decision to the United States Supreme Court.

103.  Smith's petition for relief was summarily denied. *Smith v. Mullarkey*, 547 U.S. 1067 (U.S. Apr. 17, 2006) (No. 05-1055).

104.  Two terms later, the Court decided *Caperton, supra*, thereby creating one Fourteenth Amendment for those who can afford the services of Theodore Olson, and another for those who cannot.

105.  As a direct and inescapable result of the Defendants' sloth, indolence, and/or exercise of favoritism toward moneyed interests, Smith has been denied the enjoyment of certain inalienable rights as duly acknowledged by the decisions of the United States Supreme Court, including but not limited to *Tumey v. Ohio,* 273 U.S. 510, 523 (1927) (no man can be judge in his own cause), *Claflin v. Houseman, supra* (right to have grievances grounded in federal law heard in state court of general jurisdiction), and *Marbury v. Madison, supra* (right to claim the protection of the law, when one suffers an injury).

106-110.  [Reserved.]

### C.  Smith v. Tenth Circuit Court of Appeals

111.   In *Smith v. United States Court of Appeals, for the Tenth Circuit*, 484 F.3d 1281 (10th Cir. 2007), *cert. denied*, __ U.S. ___, 128 S.Ct. 1219 (2008), Smith raised the following issues of first impression:

   a.  Does the Due Process Clause restrict the discretion of Article III judges to the point where they are required to apply the authoritative pronouncements of this and other superior courts to properly ascertained facts in the controversy before them?

   b.  Does a litigant whose First and Fifth Amendment rights to due process of law, equal protection of the law and/or access to the courts have been deprived by the willful and intentional refusal of Article III judges to follow the established precedent of their Circuit have a cause of action under a *Bivens* theory, in light of developments in common and *jus cogens* international law compelling modern States to provide an "effective

remedy" to citizens who have been denied them by government officials acting in their official capacity?

    c. Is a state attorney general immune from civil suit for actions aiding and abetting a criminal act committed by his 'clients' who are public officials?

112. The Defendant Justices addressed a question substantially similar to one raised in *Smith v. Tenth Circuit* in *Van de Kamp v. Goldstein*, 555 U.S. ___ (2009).

113. While two of the Defendant Justices were able to uncover plenty of time **during normal business hours** to debate the proper impact of international law on our own domestic law in the abstract, Antonin Scalia and Steven Breyer, Debate (at American University, Washington, D.C.), Jan. 13, 2005 (a Thursday; copy of transcript on file), they couldn't bother to explore the matter in a matter properly brought before them during their normal course of business.

114. As a direct and inescapable result of the Defendants' sloth, indolence, and/or exercise of favoritism toward moneyed interests, Smith has been denied the enjoyment of certain inalienable rights as duly acknowledged by the decisions of the United States Supreme Court, including but not limited to *Moragne v. States Marine Lines*, 398 U.S. 375, 403 (1970) (the right to rely on the authoritative declarations of the United States Supreme Court as the enforceable law of the land), *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (right to rely on the words of a statute as an authoritative declaration of what the law is), and *Ware v. Hylton*, 3 U.S. 199 (1796) and *Head Money Cases*, 112 U.S. 580, 598-99 (1884) (right to have one's rights under a 'treaty' authoritatively declared by a court).

114-120. [Reserved.]

### III.  Plaintiff Suffers Current, Ongoing, and Imminent Injury

#### A.  Smith Has Been Deprived Of the Ability To Rely On the Decisions Of Our Courts As Authoritative Declarations Of the Rule Of Law.

121.  As a direct and predictable result of the Defendants' sloth, indolence, and/or favoritism toward moneyed interests, heretofore, Smith has been repeatedly deprived of the benefits of the rule of law, to the point where he can no longer plan his affairs "with assurance against untoward surprise." *Moragne*, 398 U.S. at 403.

122.  Smith's First Amendment rights to free speech and religious expression have been and continue to be materially compromised on account of the Defendants' refusal to discharge their constitutional duties, as the courts no longer stand as a bulwark against those government agents who are wont to use their good offices to punish constitutionally protected speech they personally disapprove of. *Perry v. Sindermann*, 408 U.S. 583, 597 (1972) ("[I]f the government could deny a benefit to a person because of his [exercise of] constitutionally protected [rights], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly.  Such interference with constitutional rights is impermissible.").

123.  The Defendants' sloth, indolence, and/or favoritism toward moneyed interests has had and will continue to have both a direct and deleterious impact on Smith's freedom of expression, as when "one must guess what conduct or utterances may lose him his position, one necessarily will 'steer far wider of the unlawful zone,'" *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (quotations omitted), and "the value of a sword of Damocles is that it hangs--not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).

124.  For Smith, this is not a theoretical fear, as he has already been severely punished for the

content of his speech, in the form of the arbitrary and capricious denial of admission to the Bar of

the State of Colorado, and a malicious denial of the "process" ostensibly due him as an applicant

for a professional license: a full, fair, trial-type hearing, *Willner v. Committee on Character*, 373

U.S. 96 (1963), conducted in a timely manner, *Barry v. Barchi*, 433 U.S. 455 (1979), and a right

to have one's 'fitness' judged by reference to an ascertainable and reasonably explicit standard,

*Doe v. Civil Aeronautics Board*, 356 F.2d 699 (10th Cir. 1966), a right to a licensing agency that

will adhere to its own enabling statute, *In re Thalheim*, 853 F.2d 383 (5th Cir. 1988), and issue a

statement of reasons and indication of the proof relied upon by decisionmakers. *In re Berkan*,

648 F.2d 1386 (1st Cir. 1981), *cited with approval in, In re Suspension of Judith Ward Mattox*,

758 F.2d 1362 (10th Cir. 1985); see *also, Elizondo v. Colorado Dept. of Revenue*, 570 P.2d 518,

521 (Colo. 1977) ("without some stated guidelines, and specific findings of fact, judicial review

is a hollow gesture").

125.   "The Bill of Rights does not say who shall be doctors or lawyers or policemen.  But it

does say that certain rights are protected, that certain things may not be done." *Barsky v. Bd. of

Trustees,* 347 U.S. 442, 473 (1954) (Douglas, J., dissenting).

126.   As a direct and inescapable result of the Defendants' sloth, indolence, and/or favoritism

toward moneyed interests, the Bill of Rights has become as efficacious as the Soviet Constitution

of 1935 was for his Soviet counterparts and the promise of equal justice under law, reduced to a

mere shibboleth on the frieze of the Supreme Court building.

127-130.   [Reserved.]

**B.    The Decisions Of Our Courts Have Created a Regime Where a Republic Once Stood.**

131.   In the landmark case of *Bradley v. Fisher*, Justices of the Supreme Court granted their colleagues absolute immunity in tort for all actions taken in their judicial capacity, asserting that "[a]gainst the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." *Bradley v. Fisher*, 80 U.S. 335, 354 (1871).

132.   In the fourteen decades since *Bradley v. Fisher* was handed down, our courts have eliminated all of the remedies the law once provided for private parties, including the right to have the decision of a lower court reviewed by the Supreme Court and for the resulting written decision to become the binding law of the land, to a meaningful appellate review, and to have the law of the land applied to the true facts of the case by a fair and independent tribunal.

133.   Over the past two hundred years, federal courts have engineered a "judicial coup d'état," Bork, Coercing Virtue, *supra.,* by exercising a veto power over not only laws validly enacted by Congress, *Pierson v. Ray*, 386 U.S. 547 (1967) ("any person" in Section 1983 really means "any person but us judges," in defiance of the plain text of the statute, the legislative history (as duly pointed out in the dissent), and its status as a remedial statute (ignoring a rule of statutory interpretation literally invoked the day before in *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523 (1967)), but the plain and unambiguous text of the Constitution itself. *Hans v. Louisiana*, 134 U.S. 1 (1890) (in effect, creation of a second Eleventh Amendment; *see e.g.,* John Paul Stevens, "Two Questions About Justice," 2003 Ill. L. Rev. 821).[7]

---

[7] While liberals point to *Bush v. Gore*, 531 U.S. 98 (2000), and conservatives, to *Roe v. Wade*,

**C.   The Rights Of Pro Se Litigants Like Smith Are Disproportionately Compromised By The Aforementioned Judicial Coup.**

134.  This broad and unconstitutional arrogation of power by our imperial judiciary has led to chronic shortages of judicial personnel, as political parties are inclined to block the appointment of judges likely to use their power to rewrite the law in a manner that does not comport with their philosophy. *See*, Scalia, *On Constitutional Interpretation* (discussion at ~35 minutes).

135.   Our federal courts' contumacious refusal to apply the established law of the land to the true facts of every case has increased overall court workload by (a) rendering the law hopelessly uncertain, thereby tempting or compelling disputants to "take it to court," and (b) forcing justly

---

410 U.S. 113 (1973), as paradigmatic examples of judicial activism, few are more flagrant than Pierson. Chief Justice Warren justified their decision by proclaiming that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities," *Pierson*, 386 U.S. at 554, thereby begging the question of why Congress needed to make such a clear indication, given that any law made "under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.  The statute was clear, served a remedial purpose, was consistent with the legislative history, and directly addressed the matter of "bribed judges" oppressing Negroes and their Republican allies in the Reconstruction South. At the end of the day, the judges of the Warren Court just didn't like the idea of judges being held liable for willful misconduct on the bench by mere Negroes, and no petty annoyance like the Constitution and laws made in pursuance thereof was going to stand in their way.

aggrieved litigants to file appeals of obviously irrational decisions, both at the intermediate and Supreme Court levels.

136. The increased judicial workload, coupled with chronic personnel shortages, require the various district and circuit courts to engage in an unconstitutional form of "judicial triage."

137. The deleterious effects of the resulting "judicial triage" are visited disproportionately on *pro se* litigants -- whose only sin is that they cannot afford the astronomical costs of professional representation in complex civil rights cases -- as one Colorado-based senior federal district judge admits:

> … all pro se cases, not just civil rights cases, are treated shabbily and superficially by our courts, both bench and bar. On the bench or in opposition to a pro se litigant, it is very tempting to become annoyed because, quite frankly, it takes more time and effort to deal with the issues as they are presented, there is no implicit rebuttable presumption of trust, as there is with lawyers admitted to practice, that the citations to authority are accurate, on point and unconflicted. Perhaps, more to the point, pro se pleadings —generally speaking— force one to revisit fundamental assumptions and concepts one learned in law school. I don't think this is bad to revisit what we once learned, it's just that it takes a lot more time and time is a very precious commodity.

John L. Kane (Senior Judge, District of Colorado), e-mail (to Sean Harrington), Feb. 3, 2008.

138. As the citizenry gradually develops the perception that federal judges, particularly at the appellate level, are shiftless dastards who haven't put in an honest day's work in the past decade, they have lost confidence in their ability to be fair and honest arbiters of our disputes, as Senior Judge Miner of the Second Circuit observes:

> The major cause of the loss of public confidence in the American judiciary, however, is the failure of judges to comply with established professional norms, including rules of conduct specifically prescribed. In brief, **it is the unethical conduct of judges, both on and off the bench, that most concerns the citizenry**.

Roger J. Miner, *Judicial Ethics In the Twenty-First Century: Tracing the Trends*, 32 Hofstra L. Rev. 1107, 1108 (2004) (emphasis added).

139.  The concept of "judicial ethics" has completely imploded, as federal judges have "stuck

together" not unlike the Boston Archdiocese, in eviscerating any disciplinary regimes the other

branches of government have attempted to impose on them: Out of over 7,000 ethics complaints

lodged in the past decade against federal judges and magistrates nationwide, only one is known

to have resulted in suspension of duties.  *See,* Richard Cordero, *The Choice: Judge Sotomayor's*

*Ethnicity v. Equal Justice Under Law*, at http://judicial-discipline-reform.org (last visited Jun. 4,

2009; copy on file) ("Judge Sotomayor is a member of the Judicial Council of the 2nd Circuit,

which during those 12 years denied 100% of petitions to review complaint dismissals; she would

not protect you from a corrupt judge, regardless of your ethnicity").

140.  There may not be a bar for judicial ethics on the planet set lower than the one established

by the Tenth Circuit, as Professor Ronald Rotunda observes:

> [Senior District Judge] John Kane (who gave me permission to quote his e-mail), wrote,
> "I've been a district judge for 29 years and think the federal judicial house has brought
> this legislation on itself." He sat on the 10th Circuit Judicial Council when the first com-
> plaint about a judge came up for consideration: **A district judge was trying to coerce**
> **counsel into establishing a library on product liability cases in honor of the judge.**

> Judge Kane's e-mail is worth quoting at length. He voted for discipline. The vote was 3 to
> 3, "and so the Chief Judge voted against sustaining the complaint because it was the first
> such complaint and he thought a close vote was too slender a reed upon which to proceed.
> As we were leaving the meeting, one of the judges who had voted to dismiss collared me
> and said, 'John, think about it. **The next time it could be you or me.  We've got to stick**
> **together.'** "

Ronald Rotunda, The Courts Need This Watchdog, *Wash. Post*, Dec. 21, 2006, A-29 (emphasis

added).

141.  The usurpation of power by federal judges -- not merely beyond the bounds of Article III

but all semblance of reason -- has transformed the organized Bar into shameless Solons of servil-

ity, as Professor Carl Bogus wryly observes:

> Some people are more vulnerable to a lack of criticism than others, and among the most vulnerable are judges. ... Saying that lawyers treat the judges with deference fails to capture the interaction; it is more accurate to say that lawyers bow and scrape. Some lawyers **have elevated fawning to an art form**, pulling it off with subtle elegance. But few tell a judge she is wrong.

Carl T. Bogus, *Culture of Quiescence*, 9 Roger Williams U.L. Rev. 351, 352 (2004) (emphasis added).

142.   Pro se litigants like Smith are consistently victimized by this regime and often, to brutal effect, as evidenced by a quantitative and qualitative analysis of outcomes in both the Supreme Court and the Tenth Circuit. *See e.g., Erickson v. Pardus, supra.*

### D.   Smith Is Involved In Cases Likely To Come Before the United States Supreme Court In the Foreseeable Future.

1. *United States ex rel. Smith v. Anderson*, No. 09-cv-1018 (D.Colo. filed May 1, 2009)

143.   The actions of various judges and sundry government personnel in connection with this series of lawsuits, on the face of it, constitute serial criminal violations of the United States Code, including but not limited to 18 U.S.C. § 241 (conspiracy against rights), § 1001 (false statements) § 1341-50 (honest services mail fraud), § 3 (aiding and abetting), and § 4 (misprision of felony).

144.   The Department of Justice has established a consistent policy of declining to prosecute federal officials for felonies committed within the scope of their employment, including alleged violations of the Hatch Act, *see*, An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division, Office of Professional Responsibility (U.S. Dept. of Justice), Jul. 2, 2008 (publicly released Jan. 13, 2009); Marisa McQuilken, A Shocking Look at Bush's Civil Rights Boss, *Legal Times*, Jan. 22, 2009 (re: Bradley Schlozman),

war crimes, Mukasey Says He Won't Prosecute Waterboard Use, *National Public Radio*, Feb. 8, 2008, (with audio), at http://www.npr.org/templates/story/story.php?storyId_18803135&ft_1&-f_1001; *see,* Evan Wallach, *Drop By Drop: Forgetting the History Of Water Torture In U.S. Courts*, 45 Colum. J. Transnat'l L. (draft dated Oct. 16, 2006; copy on file) (in World War II, the Allies executed Japanese soldiers who waterboarded our troops on the grounds that it constituted a "crime against humanity."), and the apparent solicitation of bribes by a federal judge.[8]

145.  Based on the Department of Justice's track record and his conversations with an array of federal officials, Smith reasonably concluded that the government would not prosecute any crime committed by judges against him -- despite the fact that the evidence in such a case was judicially noticeable.

146.  As the denial of the right to invoke the protection of the laws would constitute a badge of slavery,[9] Smith filed an action in federal district court seeking the right to present evidence of

------------------

[8] Assuming the veracity of the news reports, one can reasonably infer that, for the better part of a decade, Mr. Notttingham spent somewhere in the neighborhood of $60,000 per year on this form of adulterous entertainment, counting reportedly frequent visits to the Diamond Cabaret -- where "$3,000 is not an unusual amount to spend" on a typical evening of debauchery.  Felisa Cardona, Feds Grill Nacchio Judge's Ex-Wife, *Denver Post*, Aug. 11, 2007.

Whereas former Gov. Elliot Spitzer (D-NY) was independently wealthy and could pay for his courtesans out of petty cash, Mr. Nottingham's Financial Disclosure Reports for the years 2006-2007 reveal that his only material source of income was his salary as a judge.  As take-home pay for a federal judge is roughly $120,000 per year, he could not have hoped to pursue his libertine hobbies at that level on his salary alone.  Moreover, as his then- and third-wife enjoyed full and unfettered access to the family finances, it would have been virtually impossible for him to conceal his nocturnal adventures, were he paying for them from his salary.  The only logical conclusion one can reach is that he was taking bribes to pay for his habit -- which further explains why he resigned without a fight, even though he needed his $3,000,000 retirement annuity.

[9] As Justice Bradley observed,

it is a right, an inestimable right, that of invoking the penalties of the law upon those who

criminal acts committed against him by agents of the federal government, and seeking to enforce the Good Behavior Clause of Article III of the Constitution pursuant to an action in the nature of a writ of scire facias.

147.   Two of the named defendants in that matter were Hon. Stephen H. Anderson and Hon. Deanell Reece Tacha of the Tenth Circuit Court of Appeals.

---

criminally or feloniously attack our persons or our property.  Civil society has deprived us of the natural right of avenging ourselves, but it has preserved to us all the more jealously the right of bringing the offender to justice. By the common law of England, the injured party was the actual prosecutor of criminal offenses, although the proceeding was in the King's name; but in felonies, which involved a forfeiture to the Crown of the criminal's property, it was also the duty of the Crown officers to superintend the prosecution. ... **To deprive a whole class of the community of this right**, to refuse their evidence and their sworn complaints, is to brand them with a badge of slavery; is to expose them to wanton insults and fiendish assaults; **is to leave their lives, their families, and their property unprotected by law.** It gives unrestricted license and impunity to vindictive outlaws and felons to rush upon these helpless people and kill and slay them at will, as was done in this case.

*Blyew v. United States*, 80 U.S. 581, 598-99 (1871) (Bradley, J.. dissenting) (emphasis added).

148.  On information and belief, Judges Anderson and Tacha were apprised of the existence of said lawsuit through a copy of the Complaint, sent via certified mail with return receipt and a request for waiver of service, mailed to their respective chambers, on or about Jul. 9, 2009.

149-150.  [Reserved.]

2.  *Smith v. Bender*

151.  In 2007, Smith filed a federal lawsuit in response to *Mullarkey II*, alleging on a *Carey v. Piphus* theory that the justices of the Colorado Supreme Court had violated his First, Fifth, and Fourteenth Amendment right of access to the courts and due process by deciding a case in which they were properly named as defendants in tort.

152.  Smith's claim was dismissed at the District Court level for putative lack of jurisdiction under an irregular application of the *Rooker-Feldman* doctrine, in open defiance of the clear and explicit dictates of the United States Supreme Court.  *Smith v. Bender*, No. 07-cv-1924-MSK-KMT (D.Colo. Jul. 11, 2008).

153.  Smith filed a timely appeal of this decision.  *Smith v. Bender*, No. 09-1003 (10th Cir. filed Dec. 30, 2008).

154.  On September 11, 2009, Smith's appeal in *Smith v. Bender, supra*, was decided by a three-judge appellate panel including Judge Anderson and Judge Tacha -- **both of which were named defendants in *United States ex rel. Smith v. Anderson*, two months after they were apprised of the latter civil and criminal action**.

155.  Smith received no advance notice of the assignment of Judges Anderson and Tacha to the Panel and as such, no opportunity to object in a timely manner.

156.  **One business day** after their opinion was rendered in *Smith v. Bender, supra*, Judges

Anderson and Tacha entered an appearance in *United States ex rel. Smith v. Anderson, supra.*

157.   In an unrelated case, Judge Tacha acknowledges that a "judge has a continuing duty to recuse under § 455(a) if sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *United States v. Pappert*, 1 F.Appx. 767, 2001.C10.0000003, ¶ 14 (10th Cir. Jan. 3, 2001) (Tacha, J.) (unpublished) (Versus-law) (quoting *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000)).

158.   "A fair trial in a fair tribunal is a basic requirement of due process. … To this end, no man can be a judge in his own case, and no man is permitted to try cases where he has an interest in the outcome." *In re Murchison*, 349 U.S. 133, 136 (1955).

159.   All three judges on the panel deciding Smith's appeal were aware of their duty to follow the precedent of their Circuit, having quoted *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam), and/or United States v. Meyers, 200 F.3d 715, 720 (10th Cir. 2000) ("The precedent of prior panels which this court must follow includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning articulates a point of law.") that very proposition in written opinions. *United States v. Nichols*, 169 F.3d 1255, 1999.C10.42296, ¶ 17 (10th Cir. 1999) (Porfilio, J.); *Systemcare Inc. v. Wang Laboratories Corp.,* 85 F.3d 465, 1996.C10.0000773, ¶ 39 (10th Cir. 1996) (Tacha, J.) *United States v. Trevizo-Cera*, No. 06-2173, 2007.C10.0000714, ¶ 21 (10th Cir. May 17, 2007) (Anderson, J.) (unpublished).

160.   The judges on that Tenth Circuit panel knew or had reason to know that a judge could not decide a case in which she had a substantial and personal financial interest without violating Smith's Fourteenth Amendment to have his grievances heard by a fair and independent tribunal,

*Tumey v. Ohio, supra; In re Murchison, supra,* that Smith had a right to have federal civil rights claims heard by a state court of general jurisdiction, *Claflin v. Houseman, supra,* that a judgment by a judge without jurisdiction to hear it was a legal nullity under Colorado law, *Davidson Chevrolet, Inc. v. City and County of Denver,* 330 P.2d 1116 (Colo. 1958), that a void judgment was not entitled to full faith and credit in federal court, *Vallely v. Northern Fire & Marine Ins. Co.,* 254 U.S. 348 (1920), and the *Rooker-Feldman* doctrine applies only to "limited circumstances" where "the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." *Exxon-Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 283 (2005), and if they weren't aware of this beforehand, they would have been properly informed of same had they read Smith's opening brief.

161.   Despite this notice, the decision of the lower court in *Smith v. Bender* was affirmed by a panel of the Tenth Circuit in an unpublished decision, which stated in pertinent part:

> In order to fully address the issues raised by Mr. Smith in this appeal, however, we also point out the following fallacies in his arguments. First, to the extent Mr. Smith is seeking to relitigate his federal-law challenges to the Colorado Supreme Court's denial of his admission to the bar of the State of Colorado, those challenges are barred by the doctrines of res judicata and collateral estoppel by virtue of: (1) this court's final decision in Mr. Smith's prior appeal to this court, *see Smith v. Mullarkey,* 67 F. App'x 535, 538 (10th Cir. 2003) (applying *Rooker-Feldman* doctrine and holding that district court correctly determined that it did not have subject matter jurisdiction over Mr. Smith's federal-law claims challenging the denial of his admission to the Colorado bar); and (2) the fact that the United States Supreme Court denied Mr. Smith's petition for a writ of mandamus and/or prohibition pertaining to that final decision, *see In re Smith,* 540 U.S. 1103 (2004).

*Smith v. Bender,* No. 09-1003, 2009.C10.0001077, ¶ 20 (10th Cir. Sept. 11, 2009) (unpublished).

162.   First and foremost, Smith made it abundantly clear in the Statement of the Case that he was not attempting to litigate his federal-law challenges in that court but rather, pointing out that

he had been deprived of his federal right to have these matters decided in a state court pursuant to

*Claflin v. Houseman, supra*, after it had been inappropriately dismissed in federal court:

> This is an action under 42 U.S.C. § 1983 for the violation of Smith's First and Fourteenth Amendment rights of access to the courts, to have grievances heard by a fair and independent tribunal, to due process of law and equal protection of the law, **arising out of an attempt by justices of the Colorado Supreme Court to decide an appeal over which they had no colorable jurisdiction.** In the alternative, it is an action for declaratory relief and/or appropriate remedies against Defendant United States under the Tenth Amendment for permitting authorized agents to issue judgments which render the Bill of Rights null and void.

Opening Br. at 12, *Smith v. Bender*, No. 09-1003 (10th Cir. filed Feb. 22, 2009).

163.  Second, as any competent judge even vaguely familiar with the workings of the Supreme Court would know, a denial of certiorari is not a review on the merits. *Brown v. Allen*, 344 U.S. 443, 489-97 (1953)  (Opinion of Frankfurter, J., stating the position of a majority of the Court on this point).

164.  Third, as any competent judge even vaguely familiar with the doctrine of res judicata would know, it only applies to a decision of a competent court on the merits, *Nwosun v. General Mills Rests., Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997) (stating the four absolute preconditions for res judicata), and by definition, cannot apply to a decision denying jurisdiction over the matter in question).

165.  Finally, as any competent judge even vaguely familiar with the doctrine of collateral estoppel would also know, it "cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case," *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc. v. Univ. of Ill. Fdn.*, 402 U.S. 313, 328-29 (1971)), which is necessarily the case when a case is dismissed on *Rooker-Feldman* grounds.

166.   On information and belief, Article III judges are among the best and brightest attorneys in the country, unlikely to stumble badly over rudimentary legal concepts like collateral estoppel, res judicata, the implications of a denial of a petition for certiorari, a judge's duty to recuse under 28 U.S.C. § 455, and the *Rooker-Feldman* doctrine.  *See,* John Pacenti, 'Judicial Salaries Are an Outrage,' Says 11th Circuit Judge, *Daily Business Review*, Dec. 9, 2008 (remarks of Senior Judge John Fay of that Circuit: "As a result, America could have a federal judiciary that is not made up of the best and brightest practicing attorneys in the nation").

167.   On information and belief, Article III judges have knowledge sufficient to take indecent liberties with the law and facts of a case in the manner explained by Judge Kozinski:

> Judges know very well how to read the Constitution broadly when they are sympathetic to the right being asserted. We have held, without much ado, that "speech, or . . . the press" also means the Internet, and that "persons, houses, papers, and effects" also means public telephone booths. When a particular right comports especially well with our notions of good social policy, we build magnificent legal edifices on elliptical constitutional phrases -- or even the white spaces between lines of constitutional text.  **But, as the panel amply demonstrates, when we're none too keen on a particular constitutional guarantee, we can be equally ingenious in burying language that is incontrovertibly there.**
>
> It is wrong to use some constitutional provisions as springboards for major social change while treating others like senile relatives to be cooped up in a nursing home until they quit annoying us. As guardians of the Constitution, we must be consistent in interpreting its provisions. If we adopt a jurisprudence sympathetic to individual rights, we must give broad compass to all constitutional provisions that protect individuals from tyranny. If we take a more statist approach, we must give all such provisions narrow scope. Expanding some to gargantuan proportions while discarding others like a crumpled gum wrapper is not faithfully applying the Constitution; **it's using our power as federal judges to constitutionalize our personal preferences.**

*Silveira v. Lockyer*, 328 F.3d 567, 2003.C09.0000276, ¶¶ 17-18 (9th Cir. 2003) (Kozinski, J., dissenting from denial of reh. en banc) (internal citations omitted; emphasis added).

168.   The Panel in *Smith v. Bender* further stated that "while we still may possess discretion to consider this claim, **we refuse to exercise such discretion in favor of Mr. Smith**." *Smith v.*

*Bender*, 2009.C10.0001077 at ¶ 23.

169.   When a federal judge places his or her hands on the scales of justice to benefit a friend or colleague -- in this case, withholding discretion where the dictates of justice would demand it -- necessarily constitutes "honest services mail fraud," as all litigants are entitled to the "honest, faithful, disinterested service [of] a public official." *United States v. Mangiardi*, 962 F. Supp. 49, 51 (M.D. Penn. 1997).

170.   There is nothing in the record to suggest that Smith filed a lawsuit against Judges Anderson and Tacha "as a ruse … in an effort to obtain a different Judge," *United States v. Greenspan*, 26 F.3d 1001, 1994.C10.40794, ¶ 39 (10th Cir. 1994), as he had no way of knowing beforehand that they would have participated in his appeal, and every reason to believe that they would not.

171.   Under the standards established in *Greenspan, supra*, Judges Tacha and Anderson had an obligation to recuse themselves, pursuant to 28 U.S.C. § 455(a).

172.   Despite the intrinsically criminal and unconstitutional nature of the activity in question, lower court judges and justices routinely indulge in what Prof. William Reynolds describes as a conspiracy between our lower court judges to engage in so-called "guerilla warfare," William L. Reynolds, *Who Are the Juristocrats? Guerilla Warfare Among the Courts* (Mar. 2005) (unpublished draft; copy on file):

> A court can make it unlikely that effective review of its decisions can ever take place. It may, for example, make creative use of fact-finding, and it may issue its opinions in such a way as to forestall careful consideration of what it does. By making review more difficult, the lower court can help forestall realization that it has ignored pronouncements from on high.
>
> 1. Fact-Finding. A trial court can always find "facts" in such a way as to insulate the case from effective appellate review. That is because review of "factual" resolutions is subject to deferential review (that is, whether there was some evidence to support the finding), as opposed to the de novo review (that is, our guess is as good as yours) given legal find-

ings. Appellate judges, of course, are alert to these kinds of shenanigans, and know how to play the game in reverse; they can do so by simply finding that the court below mischaracterized "law" as "facts." **And if the trial judge and the appellate judge are both convinced that the Supreme Court was wrong, a tacit conspiracy between the two on law and facts can achieve a lot.**

Id. at 3 (emphasis added).

173. Tacit conspiracies are no more permissible under federal civil rights law than overt ones, and when the object of the conspiracy is to deprive a citizen of his rights under law, it is a federal felony. 18 U.S.C. § 241. These are not victimless crimes.

174. Unless Smith has some way to ensure that the United States Supreme Court will review and correct the manifest errors in the Tenth Circuit's decision in *Smith v. Bender, supra*, he will be deprived of his constitutional right to equal protection of the law.

175. To allow the status quo to stand is to declare the Bill of Rights null and void, as citizens no longer in fact possess the right "to claim the protection of the laws, whenever [we receive] an injury," and the general Government no longer warrants that it will discharge its contractual duty "to afford that protection," *Marbury v. Madison*, 5 U.S. at 163, thereby literally leaving us at the mercy of scarcely more than a black-robed band of home-grown Ba'athists, who have arrogated power beyond right and wield it with all the subtlety of Saddam Hussein.

176-180. [Reserved.]

## FIRST CAUSE OF ACTION
### (Declaratory and injunctive relief: United States Constitution)

181.   Smith hereby incorporates by reference all paragraphs above as if set forth fully herein.

182.   The Defendants' conduct has violated Smith's First Amendment right to have his griev-ances decided by a fair and independent tribunal, a concomitant Fifth Amendment due process right to equal protection of the law, and his unenumerated right to rely on the binding precedent of the United States Supreme Court as an authoritative declaration of what "the law of the land" is.

183.   Smith seeks and is entitled to declaratory relief to that effect.

184.   In the absence of appropriate injunctive relief requiring Defendants to hear future claims brought pursuant to writs of error in the United States Supreme Court and the resulting decisions rendered in written opinions which become the binding law of the land, Smith has no adequate remedy at law, and is suffering and will continue to suffer irreparable harm.

185.   As a proximate and direct result of the operation of the challenged practices, Smith has been and will continue to be deprived of his federally protected rights, in the absence of appro-priate injunctive relief.

186-190. [Reserved.]

## SECOND CAUSE OF ACTION
### (Declaratory relief: United States Constitution)

191.   Smith hereby incorporates by reference all paragraphs above as if set forth fully herein.

192.   As a citizen living within and under the jurisdiction of the United States of America, at least on paper, Smith enjoys the protections of the Bill of Rights, which are intended to limit the discretion of agents of the federal and state governments.

193.   Through the federal courts' spurious invention of judicial and sovereign immunities and creation of absurd jurisdictional rules, they have rendered the Bill of Rights null and void, at least as it pertains to open and notorious abuses of power by fellow jurists, as to "take away all remedy for the enforcement of a right is to take away the right itself." *Poindexter v. Greenhow*, 114 U.S. 270, 303 (1884).

194.   The Defendants' present course of conduct violates the Bill of Rights in its entirety -- there is nothing a citizen can even do about the forced quartering of troops in one's home if the courthouse doors can effectively be closed at will by an irritated minister of justice -- reducing Smith's property interest in his liberties to a mere tenancy-at-will.

195.   In the absence of appropriate injunctive and declaratory relief as sought in Count One, Smith seeks and is entitled to declaratory relief to that effect.

## PRAYER FOR RELIEF

WHEREFORE, Smith demands relief as follows:

A.   For declaratory judgment that the Defendants' practice of considering petitions for relief on a purely discretionary basis violates litigants' Fifth Amendment due process right to equal protection of the law, First Amendment right to access to the courts for redress of grievances, and every citizen's right to rely on the pronouncements of the United States Supreme Court as authoritative statements of what "the law of the land" is, and

B.   For injunctive relief requiring the Defendants to hear every petition for review, whether brought pursuant to a writ of error or in the form of some other writ, and issue a binding published decision disposing of the appeal; or

C.   In the alternative, for a declaratory judgment stating that the Bill of Rights is null and void in its entirety, for want of a reliable enforcement mechanism; and,

D.   For Smith's reasonable attorneys' fees and court costs incurred in pursuing this action, pursuant to 42 U.S.C. § 1988; and,

E.   For such other and further relief as the Court deems just and proper.

Respectfully submitted this ⟋6th day of October, 2009.

_/s/_ _____

Kenneth L. Smith, *in propria persona*
23636 Genesee Village Rd.
Golden, CO  80401
Phone: (303) 526-5451
19ranger57@earthlink.net